**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | **JURY DEMAND** |
| **STEPHEN F. AUSTIN STATE** | § | |
| **UNIVERSITY,** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff John Doe[1] (Plaintiff or Student Doe) files this Complaint against Defendant Stephen F. Austin State University (Defendant or SFA) and respectfully shows the Court the following:

### I.

### PARTIES

1.     Plaintiff, John Doe, is a resident of Hays County, Texas.  Plaintiff is a former student and football player at Stephen F. Austin State University in Nacogdoches, Texas.

2.     Defendant Stephen F. Austin State University is a public university located in Nacogdoches County, Texas. Defendant may be served through its Interim President, Steve Westbrook Ed.D., via SFA's General Counsel, Derrick Damon, Austin Bldg., Room 310, Nacogdoches, Texas  75962.

---

[1]  Plaintiff has filed his Complaint under Pseudonym, to proceed anonymously given the extremely sensitive and private nature of the matters alleged herein and to comply with the SFA's requirement that disciplinary proceedings be kept confidential.  Plaintiff refers to himself as "John Doe" or "Student Doe."  Plaintiff refers to the female complainant in the underlying student disciplinary proceeding as "Jane Roe" or "Jane" and the witnesses the investigative team interviewed as CW# or RW# as designated by SFA's Title IX Investigator. SFA is fully aware of the actual identities of John Doe, Jane Roe and the witnesses, and will not be prejudiced in any way by use of those pseudonyms for public filings.  It is expected that SFA will not contest proceeding under Pseudonym but in the event it does contest, Plaintiff will file an appropriate motion.

3.      During all times, Stephen F. Austin State University received state and federal grants and contracts for its academic programs and activities.

## II.

## JURISDICTION AND VENUE

4.      At the time of the incidents described herein, Plaintiff was a student at SFA.

5.      This Court has jurisdiction of this case pursuant to 28 U.S.C., §1331.

6.      Venue is proper because a substantial part of the acts, events or omissions made the basis of this suit occurred in this district.

## III.

## NATURE OF ACTION

7.      Plaintiff brings this action against Defendant Stephen F Austin State University for violations of Title IX of the Education Amendments of 1972 (Title IX) in 20 U.S.C. § 1681 and deprivation of substantive and procedural due process of law under the Fifth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

8.      SFA failed to follow its own policy for resolving sexual assault complaints, was deliberately indifferent to Student Doe's rights under Title IX, and denied him basic fairness and due process. In addition, in response to Student Doe's request for crucially relevant information needed to defend himself, the SFA legal office misrepresented to the Office of the Attorney General that Student Doe was facing prosecution to prevent or delay Student Doe from obtaining information to clear his name even though the office knew or through due diligence would have learned that the District Attorney had declined to pursue criminal charges.  SFA's Title IX process and the conduct of individual university officials demonstrate: (1) the processes SFA used to resolve the complaint against Student Doe violated guidance issued by the Department of

Education Office of Civil Rights; (2) SFA officials were deliberately indifferent to Student Doe's rights under Title IX; and (3) Student Doe was denied a meaningful opportunity to respond to the allegations that deprived him of his right to continue his education at SFA and hindered his ability to continue at other institutions.

9.    Plaintiff has exhausted SFA's formal process for restoring his reputation and status, and now must turn to this Court to restore his good name and reverse the severe damage to his future professional and employment prospects.

## IV.

## FACTUAL BACKGROUND

10.    Student Doe graduated from one of the top public high schools in the State of Texas where he was the captain of football team, a member of the Century Club for volunteering over 100 hours of community service, a member of the Black History Club, and a two-sport letterman. He also was a church missionary who had never been in any trouble in school or in the community (not even a parking ticket).  During his first semester Student Doe met the female complainant (Jane Roe or Jane) and became friends.

11.    The following facts are uncontroverted and undisputed:

a.    On December 9, 2016 Jane voluntarily called Student Doe and asked him to take her to a party;

b.    Though he was unable to arrange for her to ride with him to the party, they met up with each other at the party;

c.    At the party Jane was seen by multiple witnesses rubbing her buttocks against Student Doe's groin area and "hugging" on him;

d.     Jane was seen by multiple witnesses "pursuing" Student Doe at the party;

e.     After the party Jane voluntarily went to Student Doe's dorm room with one of her friends (CW#2) to pick up the friend's keys (which the friend had asked Student Doe to retrieve after she forgot them at the party);

f.       As she left, Jane voluntarily sent Student Doe a text that stated "I'll come back";

g.       Shortly after leaving, Jane called Student Doe and invited herself back to his room;

h.       Jane says the reason for her return was so that her roommate (CW#1) and her boyfriend could have privacy in Jane's room;

i.       Jane voluntarily came to Student Doe's room at about 4:00 a.m. and acknowledged voluntarily getting into his bed;

j.       Neither Student Doe nor Jane were intoxicated or otherwise incapacitated;

k.       The police report confirms Jane did not have any acute trauma and no "body surface injuries;" and

l.       Jane does not allege Student Doe forced or otherwise coerced her to engage in intercourse.

12.     The essential disputed facts are:

a.       Jane contends at some point she fell asleep while watching TV and that while asleep Student Doe initiated sexual intercourse with her;

b.       Student Doe contends she was awake the entire time in his room;

c.       Jane contends that she woke up to find student Doe engaging in intercourse with her without consent, that she pushed him off and ran from the room screaming;

d.       Student Doe contends that Jane consented to the intimacy and that when Jane left, she was not screaming;

e.       Jane contends that despite her consent to some intimacy, the intercourse was not consensual; and,

f.       Student Doe contends the intercourse was the culmination of the consensual intimacy in which they had been engaging.

13.     A Title IX Complaint was filed and SFA undertook to investigate the complaint. The investigation culminated with a finding that Student Doe was responsible for a violation of

SFA's Title IX policies. Student Doe, to the best of his ability given the conduct of SFA, appealed that finding to no avail.

## V.

## CAUSES OF ACTION

### COUNT 1:

### VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

14.     Plaintiff incorporates by reference the facts and allegations contained in the foregoing paragraphs. In its purported investigation and adjudication of the Title IX case brought against Student Doe, SFA violated Title IX of the Education Amendments of 1972 in at least the following ways: (a) SFA employed processes that fail to comply with both former and current OCR Title IX guidance; (b) SFA officials were deliberately indifferent to student Doe's rights under Title IX; and (c) Student Doe was denied fundamental fairness and a meaningful opportunity to be heard in defense of the charges.

### A.     *SFA's Process Failed to Comply with Former and Current OCR Title IX Guidance*

15.     SFA's student affairs and legal staffs are familiar with the guidance issued by the U.S. Department of Education Office of Civil Rights (OCR) in 2001 (2001 Guidance) and the Dear Colleague Letter issued by the OCR on April 4, 2011 (2011 DCL).  Among other things, the 2001 Guidance requires universities to: (a) adopt procedures that provide for the prompt and equitable resolution of sex harassment complaints; and (b) conduct adequate, reliable, and impartial investigations of complaints, including allowing both the accused and accuser to present witnesses and other evidence.

16.     On September 22, 2017, the U.S. Department of Education rescinded the 2011 DCL but expressly left intact the 2001 Guidance.  The new Secretary of Education published a document

entitled "Q&A on Campus Sexual Misconduct" that sets out how the OCR will assess compliance with Title IX.  The new guidance requires universities to:

(a)      treat both parties equitably, including providing equal access to information and allowing both parties to offer evidence during and participate in the investigation and resolution stages of the process; and

(b)      use a preponderance of the evidence or clear and convincing evidence standard of proof when resolving sexual assault complaints.

17.      SFA violated Student Doe's rights under the rescinded and new OCR guidance. Specifically, SFA did not treat Student Doe equitably during the investigation, did not conduct an impartial investigation, did not provide him equal access to information during the investigation and did not properly apply the preponderance of the evidence standard.

18.      SFA knew that the investigator, Dr. Scott, was anything but impartial. It is difficult to imagine a more biased sexual assault investigator than one who had requested and received permission from SFA to serve as a "victim assistance (sexual assault)" consultant.  Her bias against Student Doe and partiality to Jane was reflected in how she conducted the investigation and in how she interpreted the evidence.

19.      For example, Dr. Scott:

a.      asked for and considered the opinion testimony of Jane's witnesses but there is no evidence she asked Student Doe's witnesses for their opinions or considered them if she did;

b.      admits she "pressed" witnesses who had testimony favorable to Student Doe, but there is no evidence she "pressed" Jane's witnesses the same way;

c.     considered immaterial and irrelevant exculpatory statements from Jane's witnesses, but deliberately disregarded relevant information provided by Student Doe and his witnesses;

d.     disregarded evidence provided by Jane's witnesses that was favorable to Student Doe; and

e.     illogically, inexplicably and against the weight of the evidence, concluded that the text messages Jane sent Student Doe inviting herself to Student Doe's room showed that Student Doe invited Jane to his residence.

20.     Dr. Scott also did not treat Student Doe equitably in other ways.  Upon information and belief, Dr. Scott invited Jane and two of her witnesses to be interviewed together, and that she actually interviewed Jane and CW#1 together. However, Dr. Scott did not extend the same opportunity to Student Doe.  Not only was this interview technique improper, Dr. Scott and the Dean of Students knew it violated SFA policy which states "[n]either the complainant nor the respondent will normally attend…interviews or the gathering of evidence; however, if either one is permitted to attend, the other shall have the same right."  Student Doe was denied this right under SFA policy, but more importantly, under Title IX.

21.     Dr. Scott's documented bias and the adverse impact of her violation of SFA's sexual assault policy is reflected in her interpretation of the evidence.  She knew that CW#1 was not in Student Doe's dorm room when he and Jane engaged in intercourse and knew CW#1 could not provide first-hand information about what happened in the room.  Nevertheless, she concluded that CW#1's "story was very consistent with [Jane's]." How could it have been otherwise given the only knowledge she could have would have been what Jane told her and/or what she heard when she and Jane were interviewed together.

**B.** ***SFA Officials Were Deliberately Indifferent to Student Doe's Rights under Title IX***

22.     Dr. Scott and Assistant Dean of Student Affairs and Title IX Coordinator, Dr. Walker, were deliberately indifferent to Student Doe's clearly established rights under the rescinded and new OCR interpretation of Title IX.  Dr. Walker was made aware of fundamental mistakes made by Dr. Scott and her policy violations during the investigation before he made his decision, including all of the violations mentioned above. Nevertheless, he deliberately disregarded them. Both he and Dr. Scott also intentionally failed to properly apply the preponderance of the evidence standard.  Despite knowing there was no evidence that Student Doe or Jane were intoxicated, the uncontroverted and undisputed facts about what happened that evening, and Student Doe's steadfast testimony both to the police and to them, and despite Jane never refuting that she consented to Student Doe touching her intimately or denying that just several days before she told him she wanted to be his "friend with benefits" they  somehow found it was more likely than not that the intercourse was not consensual. In addition, despite the investigation report being completely devoid of any evidence from Jane refuting Student Doe's account of the material facts about the evening and the report containing no evidence that suggested she was more credible than Student Doe, Dr. Scott and Dr. Walker found Student Doe responsible.

23.     All Dr. Scott and Dr. Walker had to do was reasonably apply SFA's definition of consent to the evidence and they would not have found Student Doe responsible for violating the SFA sexual assault policy.

24.     University policy defines "preponderance of the evidence" as the greater weight of the credible evidence or "evidence which leads a reasonable person to conclude something is more probable than not."   According to the 2011 Dear Colleague letter: "The standard of evidence for

evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided." That is exactly what happened in this instance.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-92 (1998); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011); *K.S. v. Northwest Indep. Sch. Dist.,* 689 Fed. App'x 780, 787 (5th Cir. 2017).

25.    The definition of consent reads:

"[a] voluntary, mutually understandable agreement that clearly indicates a willingness to engage in each instance of sexual activity…  Any expression of an unwillingness to engage in any instance of sexual activity establishes a presumptive lack of consent. Consent is not effective if it results from: (a) the use of physical force, (b) a threat of physical force, (c) intimidation, (d) coercion, (e) incapacitation or (f) any other factor that would eliminate an individual's ability to exercise his or her own free will to choose whether or not to have sexual activity… Even in the context of a relationship, there must be a voluntary, mutually understandable agreement that clearly indicates a willingness to engage in each instance of sexual activity."

26.     Courts have found that a school's failure to follow its own policies does not constitute deliberate indifference.  However, in this instance, both Dr. Scott and Dr. Walker were deliberately indifferent to the OCR's guidance that directs universities to treat both the complainant and respondent equitably and to apply the evidentiary standard properly.

27.     Dr. Walker's indifference is further evidenced by his inexplicable refusal to allow Student Doe to substitute a revised copy of his appeal of the investigation report.   Further, he and SFA's public information officer knowingly refused to give Student Doe access to his educational records before the deadline to appeal.

28.     On January 27, 2017, Dr. Walker refused to allow Student Doe to substitute a final copy of his appeal of the investigation report for a draft copy that was inadvertently sent by his attorney's staff. Instead, Dr. Walker gave the reviewing committee an unfinished and a finished version that would more clearly state his appeal.

29.     On February 15, 2017, Student Doe asked Dr. Walker and SFA's public information office for his entire conduct file, including the investigation file.  Student Doe was entitled to timely production of the records under SFA's Student Records Policy (Policy 2.10) and the Family Educational Rights and Privacy Act (FERPA).  While the Student Records Policy gives SFA forty-five (45) days to provide records, and the Public Information Act gives SFA ten (10) business days to decide whether to provide public information, Dr. Walker knew that Student Doe asked for the records as part of the Title IX resolution process and knew how important the investigation was to Student Doe's appeal. Nevertheless, he intentionally refused to provide Student Doe the information and grant him an extension to file his appeal.   Dr. Walker's callousness was magnified by the fact that the appeal was due the Friday before Spring Break and an extension would not have unreasonably delayed resolution of the complaint.

30.     It is unfathomable that a student receives more due process for writing graffiti on a university building than when accused of one of the most stigmatizing violations he could face on a university campus. But that is exactly what happened to Student Doe and is happening at SFA.

31.     Further, the public information officer opposed release of some of the information Student Doe requested, arguing that Student Doe was facing prosecution. However, he knew or should have known that the District Attorney had declined prosecution; and he certainly had an obligation to use due diligence to ascertain this fact before making a representation to the Attorney General and denying Student Doe information he needed for his appeal.

*C.*     ***Student Doe was Denied Fundamental Fairness and a Meaningful Opportunity to be Heard***

32.     Dr. Peck also was equally indifferent in failing to properly apply the preponderance of the evidence standard. He expressly found "there was no evidence of premeditated predatory behavior, use of physical force, use of weapons or other means of incapacitation." Despite finding there was no evidence of incapacitation or use of force, despite evidence that Jane voluntarily came to Student Doe's room and voluntarily got into his bed, despite there being no evidence contradicting Student Doe's testimony that Jane invited him to touch her, and despite there being no evidence that she said "no" or engaged in behavior that would have contradicted her verbal and physical consent to engage in intimacy, Dr. Peck simply rubber stamped Dr. Walker's decision.

33.     Student Doe was not given a clear explanation of the procedures that would be used to resolve the sexual assault complaint in violation of OCR guidance. Moreover, he was denied fundamental due process before and after he was suspended from school.  Student Doe was never given an opportunity to question his accuser or even the opportunity to submit questions to SFA officials to ask her; he was never given the opportunity to question the two witnesses Jane

presented and who Dr. Scott purports to rely upon in reaching her conclusions; he was never given the opportunity to question Dr. Scott whose investigation report is replete with inaccuracies, inconsistencies and patently incompetent investigation methods and analysis; and he was denied the opportunity to question the individuals who reviewed the investigation report (presuming such a review occurred) to confirm they considered the evidence he presented and were aware of Dr. Scott's documented bias toward alleged sexual assault victims.

In a letter, dated February 21, 2017, Dr. Peck informed Student Doe that he had the "right to appeal the sanctions as outlined in the Student Code of Conduct." However, in a March 6, 2017 email, he said "[b]ased on the current policy" Student Doe was "not entitled to a re-hearing of the facts of the case regarding the severity of the sanctions under…the student code of conduct policy." However, section R of the code of conduct in effect at the time of Student Doe's case states: The rights outlined below will be accorded to any student…for an alleged violation of the code of conduct….a. to be present at the hearing; b. to meet with the student conduct administrator to discuss the disciplinary process…" Student Doe timely filed his appeal but nevertheless SFA denied him his right to a hearing under its student code of conduct.

34.     As a direct, proximate and foreseeable consequence of SFA's Title IX violations set forth above, Student Doe has sustained and will continue to sustain significant damages including, but not limited to, severe emotional distress, damages to his emotional and psychological well-being, damages to his reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects and other direct and consequential damages in an amount greatly in excess of $75,000.

35.     As a result of the foregoing, Student Doe is also entitled to a mandatory injunction ordering SFA to expunge the erroneous investigation finding and restoring his good conduct record.

36.     Student Doe is also entitled to the recovery of attorney's fees, costs and pre-judgment interest.

37.     Student Doe demands that judgment be entered in his favor and against SFA for compensatory and punitive damages in an amount in excess of $75,000, the minimum jurisdictional limits of this court in addition to pre-judgment interest, injunctive relief, attorneys' fees, expenses, costs and other relief to which he may be entitled at law or in equity.

# COUNT 2:

## DEPRIVATION OF DUE PROCESS UNDER THE 5TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION

### A.     *SFA Engaged in Unlawful Title IX Discrimination*

38.     In its purported investigation and adjudication of Student Doe's Title IX case, SFA completely disregarded Student Doe's constitutional rights to due process.

39.     As the current U.S. Secretary of Education and many courts across the country are making clear, universities are violating Title IX by erroneously imposing discipline against male students accused of sexual assault.  SFA's treatment of Student Doe is the posterchild for the gender bias that is resulting in these "erroneous outcome" cases. SFA knowingly appointed a fundamentally biased employee to investigate the allegation against Student Doe, allowed the Assistant Dean of Students to knowingly deny Student Doe a full and fair investigation as required by Title IX, and endorsed the Vice President for Student Affairs' intentional violation of Student Doe's due process.

40.     Student Doe placed SFA on notice of his claims in a letter dated March 15, 2017. The facts set forth in that letter "cast… doubt on the accuracy of the outcome of the disciplinary proceeding" against Student Doe.  *Pacheco v. St. Mary's University*, 2017 WL 2670758, (W. District Texas, 2017) and ably demonstrated how unfairly SFA treats its male students.

41.     SFA suspended Student Doe knowing that the investigation upon which the action was taken was unfair, objectively incompetent, and conducted by a biased investigator. Those facts include:

a.      SFA allowed Dr. Scott to engage in outside employment as a sexual assault "victim assistance" consultant. (A material fact she, Dr. Scott, knowingly and intentionally omitted from her 14-page resume in an effort to conceal her gender bias.)

b      Based on information and belief, Dr. Scott only counseled women who accused men of sexual assault.

c.      Dr. Scott previously had been coach of the SFA dance team and knew Jane was a member of the SFA dance team.

d.      Dr. Scott invited Jane's female witnesses to sit in with Jane during her interview and in fact allowed CW#1 to participate in her interview, but she did not invite or allow any of Student Doe's witnesses to sit in on the interviews.

e.      Dr. Scott concluded that the female witness's "story was very consistent with [Jane's]" even though she knew the witness was not in Student Doe's dorm room during the intercourse and had no first-hand knowledge of what occurred in the room.

f.      Dr. Scott asked for and considered the opinion testimony of Jane's witnesses, but she never asked Student Doe's male witnesses for their opinions regarding the allegation.

g.      Dr. Scott admitted she treated male witnesses differently by "press[ing]" them during her interviews, but she did not do the same to Jane's female witnesses.

h.      Dr. Scott deliberately misinterpreted Jane's text message in which she invited herself to Student Doe's room to instead mean that **Student Doe invited her** to his room. (This

misinterpretation reflects Dr. Scott's stereotypical thinking about males which gives rise to another theory of recovery under Title IX.

i.      Dr. Scott deliberately disregarded relevant information provided by Student Doe's male witnesses and by Student Doe himself.

j.      Dr. Scott knowingly and maliciously withheld from the investigation report the fact that Jane and her mother told Dr. Scott they did not want Student Doe to get into any trouble.

k.      The Assistant Dean of Students, Dr. Walker, the Dean of Student Affairs, Dr. Peck, and SFA's general counsel knew Dr. Scott's conduct clearly violated Title IX, as well as SFA's policy which states "[n]either the complainant nor the respondent will normally attend…interviews or the gathering of evidence; however, if either one is permitted to attend, the other *shall* have the same right."

**B.      _SFA Engaged in Unlawful Title IX Retaliation_**

42.      SFA retaliated against Student Doe for opposing SFA's gender bias. Although SFA officials knew Student Doe was entitled to his entire student conduct file, including the investigation file, under federal law (the "Family Educational Rights and Privacy Act" or "FERPA"), they forced him to request it under both FERPA and the Texas Public Information Act.

43.      Dr. Walker knew Student Doe needed his records to defend against the sexual assault allegation. Nevertheless, he denied Student Doe's request for an extension to file his appeal until after he received his records. Dr. Walker demonstrated his deliberate indifference to Student Doe's rights under Title IX by denying the extension even though the appeal was due the Friday before Spring Break and an extension would not have unreasonably delayed resolution of the complaint.

44.     In addition to retaliation by Student Affairs officials, the SFA's general counsel also repeatedly retaliated against Student Doe. The general counsel repeatedly made false representations to the Office of the Attorney General Open Records Division, intentionally engaged in dilatory tactics before releasing information, and intentionally overcharged Student Doe for information in retaliation for Student Doe opposing SFA's violations of Title IX.  For example:

a.      Student Doe asked SFA for the video recording of the SFA police officer's meeting with him the day after the alleged assault.  The SFA general counsel opposed release of the video by misrepresenting to the Office of the Attorney General that Student Doe was facing criminal prosecution even though he knew, or through due diligence would have learned, that the District Attorney had declined to pursue criminal charges weeks before Student Doe's request.

b.      The SFA general counsel asked the Office of the Attorney General to deny Student Doe's request for information because he believed the request for information was "written by an attorney."  The SFA general counsel knows there is no provision in the Texas Public Information Act that allows a university to withhold information because a student's request may have been written by an attorney.  In other words, the SFA general counsel attempted to withhold public information from Student Doe because he thought Student Doe had retained an attorney to oppose SFA's Title IX violations.

C.      *SFA Failed to Provide Adequate Due Process*

45.     SFA's Student Code of Conduct was so procedurally inadequate that it resulted in an arbitrary and capricious decision and denied Student Doe the full benefits and privileges of attending SFA. It is clearly established that a student who is dismissed for disciplinary reasons is entitled to an "informal 'give-and-take'…that would at least give the student 'the opportunity to

characterize his conduct and put it in what he deems the proper context." *Goss v. Lopez*, 419 U.S. 565, 584 (1975); *Perez v. Texas A&M Univ. at Corpus Christi*, 589 Fed. Appx. 244, 249 (5th Cir. 2014).  It is equally well established that the severity of the potential deprivation and stigma that will attach dictates the contours of the process that must be given.  *UT Medical School at Houston v. Than*, 901 S.W.2d 926 (Tex. 1995).

46.     SFA either is ignorant of or has total disregard for clearly established law as SFA gives more rights to students accused of writing graffiti on a wall than to students who are accused of one of the most heinous criminal acts in our society.  As a result, Student Doe had to endure the indignity and stigma of having to leave SFA in the middle of the semester; the loss of a full semester of academic credit, tuition, fees and room and board; and destruction of his intercollegiate athletic career.

47.     The sheer callousness and constitutional inadequacy of SFA's process are demonstrated by the following facts.  Student Doe never:

a.      Received the opportunity to confront his accuser (even by submitting written questions, which was allowed under the now rescinded April 4, 2011 U.S. Department of Education Office of Civil Rights Dear Colleague Letter);

b.      Received the opportunity to cross-examine, in any form, the female witnesses who supposedly provided testimony against him;

c.      Received the opportunity to cross-examine Dr. Scott – an opportunity that certainly would have revealed her history of male bias and deliberate denial of a fair investigation;

d.      Had the opportunity to verbally tell his story to any SFA officials responsible for determining whether he violated the code of conduct;

e.     Had to use the state's open records act to obtain evidence of bias that was known to SFA;

f.     Was told the names of the panel of SFA officials who reviewed his case (and who may harbor biases); and

g.     Had the opportunity to see the evidence the panel considered;

48.     Student Doe was denied these opportunities even though the SFA Student Code of Conduct in effect at the time appeared to allow them. In a letter dated February 21, 2017, Dr. Peck informed Student Doe that he had the "right to appeal the sanctions as outlined in the Student Code of Conduct."  At the time, Section R of the Code stated: "[t]he rights outlined below will be accorded to any student…for an alleged violation of the code of conduct… a. to be present at the hearing; [and] b. to meet with the student conduct administrator to discuss the disciplinary process."  However, approximately two weeks later Dr. Peck told Student Doe that he was "not entitled to a re-hearing of the facts of the case regarding the severity of the sanctions under…the student code of conduct policy." Either the policy is constitutionally inadequate as a matter of law, or Dr. Peck knowingly and intentionally denied Student Doe his clearly established constitutional right to due process.

49.     This is not the only clearly established right SFA officials denied Student Doe. Dr. Scott, Dr. Walker and Dr. Peck knowingly and intentionally failed to apply the preponderance of the evidence standard. In fact, based on information and belief, Dr. Scott said the evidence was "50-50."  These officials also knowingly and intentionally misapplied SFA's definition of consent.

50.     It is anticipated that discovery will confirm other violations, including possibly by members of the panel that, upon information and belief, reviewed and approved the investigation finding and disciplinary sanction.

18

51.     As a direct, proximate and foreseeable consequence of SFA's constitutional violations set forth above, Student Doe has sustained and will continue to sustain significant damages including, but not limited to, severe emotional distress, damages to his emotional and psychological well-being, damages to his reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects and other direct and consequential damages in an amount greatly in excess of $75,000.

52.     As a result of the foregoing, Student Doe is also entitled to a mandatory injunction ordering SFA to expunge the erroneous investigation finding and restoring his good conduct record.

53.     Student Doe is also entitled to the recovery of attorney's fees, costs and pre-judgment interest.

54.     Student Doe demands that judgment be entered in his favor and against SFA University for compensatory and punitive damages in an amount in excess of $75,000, the minimum jurisdictional limits of this court in addition to pre-judgment interest, injunctive relief, attorney's fees, expenses, costs and other relief to which he may be entitled at law or in equity.

## VI.

## JURY DEMAND

55.     Plaintiff demands a jury trial in accordance with Federal Rule of Civil Procedure 38.

## VII.

## PRAYER FOR RELIEF

56.     For the foregoing reasons, Plaintiff prays that Stephen F. Austin State University be summoned to appear and answer; that upon final hearing and jury trial Plaintiff recover a

judgment against Stephen F. Austin State University for actual and exemplary damages, attorney's fees, pre-judgment and post-judgment interest as allowed by law; injunctive relief as requested above; and for such other and further relief as allowed by law.

Dated January 18, 2019.

Respectfully submitted,

TATE MOERER & KING, LLP

*/s/ Richard L. Tate*
**Richard L. Tate**
State Bar No. 19664460
206 South 2nd Street
Richmond, Texas 77469
E-mail rltate@tate-law.com
Tel. (281) 341-0077
Fax (281) 341-1003

ATTORNEY FOR PLAINTIFF